# COURT OF APPEALS
## DECISION
## DATED AND FILED

## March 14, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1394**

Cir. Ct. No. **2015ME181**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF T. R. H.:

MARATHON COUNTY,

PETITIONER-RESPONDENT,

V.

T. R. H.,

RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Reversed*.

¶1 STARK, P.J.[1] Thomas[2] appeals from a recommitment order and an associated order for the involuntary administration of his medication and

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

treatment. Thomas argues that these orders must be reversed because, in finding him dangerous, the circuit court failed to reference a specific statutory subdivision paragraph in WIS. STAT. § 51.20(1)(a)2. and failed to make the required factual findings as mandated by *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277. Additionally, Thomas argues that Marathon County failed to prove by clear and convincing evidence that he was dangerous.

¶2 We conclude that the circuit court found Thomas was dangerous under WIS. STAT. § 51.20(1)(a)2.c.; however, we further conclude that the court's finding in that regard was clearly erroneous because the County failed to meet its burden to prove that Thomas was dangerous as required for recommitment under that subdivision paragraph. We therefore reverse the recommitment and involuntary medication and treatment orders.[3]

## BACKGROUND

¶3 Thomas was initially committed in 2015, and he has remained under commitment since that time. In January 2022, the County filed a petition for Thomas's recommitment. At the time of the petition, Thomas was seventy-one

---

[2] For ease of reading, we refer to the appellant in this confidential appeal using a pseudonym, rather than his initials.

[3] Thomas separately argues that the involuntary medication and treatment order must be reversed because the County did not provide sufficient testimony to meet its burden of proof. However, an order allowing for the involuntary administration of medication and treatment requires the existence of a valid commitment order. *See* WIS. STAT. § 51.61(1)(g)3. Because we reverse the commitment order, reversal of the associated involuntary medication order is also required and we need not address Thomas's separate argument regarding that order. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (the court of appeals need not address all issues if one issue raised by the parties is dispositive).

years old, living independently, taking care of his daily needs and finances without assistance, and was receiving outpatient services.

¶4    The County called Drs. John Coates and Courtney Derus as witnesses at the recommitment hearing.  Both doctors wrote reports prior to the hearing, but neither of the doctors' reports were admitted into evidence.  No treatment records were submitted as evidence at the hearing.  Thomas also testified at the hearing.

¶5    Thomas was scheduled to meet with Dr. Coates prior to the hearing, but Coates testified that Thomas failed to appear.  Thomas later testified that he was ill at the time of his scheduled appointment with Coates.  Coates stated that he last met with Thomas in August 2021.  While Coates agreed that it was possible Thomas had improved since that time, he testified that he did not have a recent opportunity to assess Thomas.  Coates did recall that when they last met, Thomas was taking medication and was stable enough to remain in the community but "still was symptomatic."

¶6    Doctor Coates testified that he reviewed Thomas's treatment records to prepare his report and testify at the hearing.  He diagnosed Thomas with schizophrenia, paranoid type, explaining that the condition qualified as a substantial disorder of mood or thought that is treatable, mainly with psychotropic medication.  Coates testified that, in the past, Thomas had problems with delusions, paranoia, and disorganized thinking.  Additionally, Coates testified that he believed Thomas had a history of treatment noncompliance and Thomas had been hospitalized multiple times.  Coates stated that Thomas had been on the same medication for "a couple of years."

¶7      Doctor Coates acknowledged that "over the past few years there has been some stability" for Thomas, but Coates noted he believes Thomas "continues to have persecutory, grandiose delusions and … social impairment."  If treatment were withdrawn, Coates testified that it was his belief Thomas would "become a danger to himself."  Coates explained that when treatment has been withdrawn from Thomas in the past, Thomas has shown "some social impairment," but without treatment, Thomas mainly presents "a danger to himself in terms of lack of self-care."  Specifically, Coates testified that when Thomas "goes off his medication[,] his thinking becomes grossly disorganized," he faces "mood instability" and "gets to a point where he just cannot properly socialize.  He has trouble interacting with others."  As an example of this behavior, Coates stated that he has seen Thomas with "facial makeup on" while "acting very, very bizarre."

¶8      Doctor Coates opined that if Thomas were not under a commitment order, he would likely stop taking his medication.  Coates testified that he believes Thomas is "incompetent to apply a good understanding of the advantages and disadvantages" of his medication due to Thomas's "lack of insight and impaired judgment."  Coates also opined that there was a substantial probability Thomas would develop impaired judgment if treatment were withdrawn, and his impaired judgment was likely to result in further harm to either Thomas's own physical health or the health of others.

¶9      Doctor Derus testified that she was also unable to meet with Thomas prior to the hearing.  Thomas later explained that he had attempted to attend the examination with Derus at 1:30 p.m. on a Friday but that "[Derus] wouldn't see [him]" as she thought he was untidy.  Similar to Coates, Derus testified that she last met with Thomas in August 2021 and had not seen him since that time.  Derus

4

also reviewed Thomas's treatment records to prepare her report and her testimony. Derus testified that Thomas's treatment records indicated that, in the past, he had "demonstrated a lack of treatment compliance due to a lack of insight about his mental illness and some paranoia." The prior paranoia that Thomas had exhibited, Derus explained, was in regard to his treatment providers who he thought were "retaliating or threatening him."

¶10 Doctor Derus diagnosed Thomas with schizophrenia, a condition she also stated qualified as a substantial disorder of mood or thought and a mental illness that can be improved with treatment. Derus opined that if treatment were withdrawn, Thomas would present a substantial probability of harm to himself or others. Derus explained that Thomas's records "indicate that he has [a] history of delusions that are paranoid in nature and he could become dangerous due to his lack of reality testing." She further testified that Thomas "has an inability to function adequately in the community." If Thomas were not under court-ordered commitment and treatment, Derus testified that based upon his past history, there was a substantial probability of Thomas's judgment becoming impaired, and that impaired judgment was likely to result in physical impairment to Thomas. Lastly, Derus testified that she believed Thomas was not competent to accept or refuse medication due to his mental illness.

¶11 Thomas testified that, at the time of the hearing, he lived in a rental unit that he paid for on his own. He was not working, but he testified that he had hobbies and collected social security retirement income monthly, and he stated the monthly amount he received from social security. Thomas testified that he had no difficulty managing his own finances, and that he had his own bank account and credit card. Thomas explained he had a cell phone that he operated by himself. He also testified that he knew his own credit score and stated that number when

asked. If he became ill or injured, Thomas that testified he knew how to get himself to the hospital. Furthermore, Thomas stated he had not fallen recently.

¶12 Thomas further testified that he owned a car, which he drove to court for the hearing. He explained that no one helped him with his living situation and he completed his own shopping. Thomas testified that he was able to independently dress and bathe himself, and take his medication. He stated that he currently took ten milligrams of Olanzapine and that the medication makes him "focus" and become "more stable." If he were not under a commitment order, Thomas testified that he would still take his medication and see his doctor, noting that he liked his current doctor. Thomas further testified that he had no recent suicidal thoughts or thoughts about harming others.

¶13 The circuit court concluded that Thomas was mentally ill and had a treatable condition. Relying on the testimony of Drs. Coates and Derus, the court found that the County presented clear and convincing evidence in support of Thomas's recommitment. The court stated that "the big issue here is not so much what [Thomas's] current level of functioning is, but it's to look forward to what his level of functioning would be if treatment were withdrawn." Mentioning how "both doctors testified that historically [Thomas] has not indicated a willingness to take his medications," the court determined that the doctors believed Thomas presented "a substantial likelihood that he would become a proper subject for treatment if treatment were withdrawn based upon an impaired judgment." The court further noted that Thomas presented "a substantial probability of physical impairment to himself."

¶14 "[B]ased upon the opinions of the doctors," the circuit court also stated that Thomas was "substantially incapable of applying an understanding of

6

the … advantages and disadvantages of medication" "due to his mental illness." The court ordered a twelve-month extension of Thomas's commitment. At the end of its ruling, the court addressed Thomas stating that "it's no comment as to how you're doing now, you're doing well, and I think it's just appropriate that you continue on the course you're on."

¶15 After the hearing, the circuit court entered written orders for the extension of Thomas's commitment and allowing for the involuntary administration of his medication and treatment. The court checked a box in the written extension order stating that Thomas was dangerous because there was "a substantial probability of physical impairment or injury to himself … or other individuals due to impaired judgment." The form also stated that this risk was manifested or shown in Thomas by "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Thomas now appeals from both orders.

## DISCUSSION

¶16 Thomas does not dispute that he is mentally ill and a proper subject for treatment. He challenges only the circuit court's conclusion that he is dangerous. Whether a petitioner has "presented clear and convincing evidence to justify recommitment is a mixed question of fact and law." *Sauk County v. S.A.M.*, 2022 WI 46, ¶17, 402 Wis. 2d 379, 975 N.W.2d 162. A circuit court's findings of fact are upheld unless they are clearly erroneous, but whether those facts satisfy the statutory standard of dangerousness is a question of law that we review de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901; WIS. STAT. § 805.17(2). "[A] finding of fact is clearly erroneous

when 'it is against the great weight and clear preponderance of the evidence.'" *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615 (citation omitted).

¶17    For an individual to be recommitted, the petitioner must prove that the individual fulfills three requirements: "the subject must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." *Sheboygan County v. M.W.*, 2022 WI 40, ¶¶17-18, 402 Wis. 2d 1, 974 N.W.2d 733; WIS. STAT. § 51.20(1)(a)1.-2.  "Upon each petition to extend a term of commitment, a county must establish the same elements with the same quantum of proof."  *Waukesha County v. J.W.J.*, 2017 WI 57, ¶20, 375 Wis. 2d 542, 895 N.W.2d 783.

¶18    There are five ways a petitioner can meet its burden to prove dangerousness.  *Outagamie County v. Michael H.*, 2014 WI 127, 359 Wis. 2d 272, 856 N.W.2d 603; WIS. STAT. § 51.20(1)(a)2.a.-e.  Each recommitment hearing requires proof of "<u>current</u> dangerousness," and "[i]t is not enough that [an] individual was at one point dangerous."  *D.J.W.*, 391 Wis. 2d 231, ¶34 (citation omitted).  "[C]ircuit courts in recommitment [hearings] are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based."  *Id.*, ¶40.

¶19    "Because an individual's behavior might change while receiving treatment, WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior" to a recommitment hearing.  *M.W.*, 402 Wis. 2d 1, ¶19 (citation omitted).  Section 51.20(1)(am) allows a petitioner to prove dangerousness by showing that there is "a substantial likelihood, based on the

subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." This alternative path does not change the requirement that the petitioner prove, by clear and convincing evidence, that the individual in question is mentally ill, a proper subject for treatment, and currently dangerous. *Waupaca County v. K.E.K.*, 2021 WI 9, ¶26, 395 Wis. 2d 460, 954 N.W.2d 366, *cert. denied*, 142 S. Ct. 594 (2021).

¶20 Thomas argues that the recommitment order must be reversed because the circuit court failed to comply with *D.J.W.*'s requirement that the court make factual findings regarding his dangerousness with reference to the specific subdivision paragraph in WIS. STAT. § 51.20(1)(a)2. on which his recommitment was based. Additionally, Thomas notes that the County, in its petition and at the recommitment hearing, did not reference a subdivision paragraph under which it sought his recommitment.

¶21 The County concedes the latter point, acknowledging that it failed to specify—at least by specific statutory reference—the dangerousness standard on which it relied in seeking Thomas's recommitment. However, the County argues that the circuit court complied with *D.J.W.*'s requirement because it restated the language of WIS. STAT. § 51.20(1)(a)2.c. in its oral ruling, and the written order contained language that mirrored § 51.20(1)(a)2.c. as well.

¶22 Based upon the circuit court's oral ruling and its written order, we agree with the County and conclude that the court found Thomas dangerous under WIS. STAT. § 51.20(1)(a)2.c. Section 51.20(1)(a)2.c. states that an individual can be found dangerous if he or she "evidences such impaired judgment … that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." In its written order, the court checked a box that stated Thomas

presented "a substantial probability of physical impairment or injury to himself … or other individuals due to impaired judgment." That language mirrored part of the wording in § 51.20(1)(a)2.c. And in its oral ruling, the court found, based on the doctors' testimony, that Thomas presented "a substantial likelihood that he would become a proper subject for treatment if treatment were withdrawn based upon an impaired judgment and … a substantial probability of physical impairment to himself." Again, this language mirrored the dangerousness standard set forth in § 51.20(1)(a)2.c.

¶23 Under *D.J.W.*, however, the circuit court was not merely required to identify which dangerousness standard it relied on in finding Thomas dangerous; the court was also required "to make *specific factual findings*" referencing a subdivision paragraph in WIS. STAT. § 51.20(1)(a)2. on which the recommitment was based. *See D.J.W.*, 391 Wis. 2d 231, ¶3 (emphasis added). Here, we conclude the court failed to make the required factual findings.

¶24 The County argues that the circuit court implicitly adopted the findings and conclusions of Drs. Coates and Derus[4] regarding dangerousness, specifically emphasizing the doctors' opinions regarding Thomas's level of functioning if treatment were to be withdrawn. Moreover, the County points out that the court noted, in its ruling, Thomas's historical unwillingness to continue his medication and the connection between that unwillingness and Thomas's impaired judgment, leading Thomas to be dangerous to himself or others.

---

[4] The County, in its briefing, states "the findings and conclusions of Doctors Coates and *Starr*." (Emphasis added.) Given that the two testifying doctors in this case were Coates and Dr. Derus, we assume that the County meant to refer to Derus.

¶25    While the County correctly notes that the circuit court relied upon both doctors' findings and conclusions in finding Thomas dangerous, the court made no specific factual findings in support of its dangerousness determination. The doctors' testimony failed to provide any evidence as to how Thomas would become dangerous to himself or others if treatment were withdrawn, and the court did not cite any evidence establishing that factor in its oral ruling and written order.

¶26    Doctor Coates testified that he believed Thomas would cease taking his medication if he were not under a commitment order. Should that occur, Coates opined that Thomas would then possibly experience disorganized thinking, mood instability, and impaired judgment, and could become delusional and paranoid. Based on Thomas's history from an unspecified time, Coates also testified that when Thomas stopped taking his medication in the past, he exhibited a lack of self-care, antisocial behavior, and had difficulty interacting with others. Dr. Derus testified that Thomas "has an inability to function adequately in the community," and if Thomas were not under court-ordered commitment and treatment, there was a substantial probability of Thomas's judgment becoming impaired, with that impaired judgment likely to result in physical harm to Thomas.

¶27    However, there was no evidence presented—and, accordingly, the circuit court made no findings—as to *how* these behaviors and possible future symptoms would cause physical impairment or injury to Thomas, or otherwise make him a danger to himself or others. As a result, the doctors' testimony was insufficient for the court to make a factual finding that there was "a substantial likelihood that [Thomas] would become a proper subject for treatment if treatment were withdrawn based upon an impaired judgment." The court merely repeated

the statutory language without relying upon any facts in the record, which is insufficient to comply with *D.J.W.*

¶28    Even if we were to conclude that the circuit court made specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2.c. on which the recommitment was based, we would conclude that such findings are clearly erroneous.  As Thomas contends, the County failed to prove there was a substantial likelihood that he would be a proper subject for commitment if treatment were withdrawn.  Thomas correctly argues that dangerousness "cannot be assumed from [a] prior commitment order" and that the County "provided no evidence of dangerous acts that meet the standard in WIS. STAT. § 51.20(1)(a)2.c."  Thomas further argues that each recommitment must be based on "current, dual findings of mental illness and dangerousness."  *See Portage County v. J.W.K.*, 2019 WI 54, ¶21, 386 Wis. 2d 672, 927 N.W.2d 509.

¶29    The County asserts that it presented sufficient evidence for Thomas's recommitment under WIS. STAT. § 51.20(1)(am) and that Thomas improperly focuses solely on whether the County presented evidence of his recent acts or omissions evidencing his dangerousness.  It claims that the circuit court properly relied on the doctors' testimony about Thomas's long-standing history of mental illness that was accompanied by problems with delusions, paranoia, and disorganized thinking when treatment was withdrawn.  The County contends that the doctors in this case testified regarding Thomas's previous behaviors and continuing patterns, and the court then reasonably relied on that testimony when making its required findings.  According to the County, behavior prior to, or earlier in, a commitment is a proper basis for a finding of current dangerousness under the recommitment standard because "[d]angerousness in an extension proceeding can and often must be based on the individual's precommitment

behavior, coupled with an expert's informed opinions and predictions." ***Winnebago County v. S.H.***, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761. The County therefore argues that the evidence was sufficient in this case to support a finding that Thomas is currently dangerous if treatment were withdrawn.

¶30 We disagree and conclude that the evidence presented at the hearing was insufficient to prove, by clear and convincing evidence, that Thomas would be a proper subject for commitment under WIS. STAT. § 51.20(1)(a)2.c. if his treatment were withdrawn. The County presented no evidence about Thomas's past dangerousness. Further, it failed to present any evidence about how Thomas was dangerous in the past when he was not receiving treatment, or how Thomas would likely become dangerous at this time if treatment were withdrawn such that there would be "a substantial probability of physical impairment or injury to himself … or other individuals." *See* § 51.20(1)(a)2.c.

¶31 The County argues that it provided sufficient evidence of how Thomas would become dangerous to himself or others if his treatment were withdrawn. Specifically, it points to Dr. Coates' testimony that Thomas becomes "grossly disorganized" "when [he] is off his medications" and that Thomas experiences "mood instability" and disorganized thoughts. In the past, and without treatment, Coates testified that Thomas reached a point where he could not interact with others or care for himself.

¶32 The County, however, presented no evidence as to when these prior symptoms occurred or how they caused Thomas to become a danger to himself or others. Likewise, the County provided no specifics as to how Thomas has failed to care for himself in the past or why his ability to interact with others caused a "substantial probability of physical impairment or injury to himself … or other

13

individuals." *See* WIS. STAT. § 51.20(1)(a)2.c. At most, the evidence showed that Thomas has previously failed to maintain his self-care, has exhibited paranoia and had delusions, and may have not interacted in a socially appropriate manner. None of these behaviors—especially without evidence of specific incidents— clearly and convincingly show that Thomas was dangerous under § 51.20(1)(a)2.c. at the time of the recommitment hearing, or would likely become so if his treatment were withdrawn. *See* § 51.20(1)(am).

¶33 Accordingly, the County failed to present clear and convincing evidence that Thomas was dangerous under WIS. STAT. § 51.20(1)(a)2.c. and (1)(am). We therefore reverse the recommitment order and the associated involuntary medication order.

*By the Court.*—Orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.